AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>TOM KIM LOI LAM and<br>JIMMY GONG YAN LEE, a/k/a "Gong Yan Lee,"<br><br>Defendant(s) | Case No.<br><br>3-14-71520  LB |

FILED
2014 DEC -9  A 11: 04
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 2012 through January 2014__ in the county of __San Franisco and elsewhere__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 371 | Conspiracy |
| 18 U.S.C. Sec. 666(a)(2) and 2 | Bribery relating to federal program |
| 18 U.S.C. Sec. 201(b)(1)(B) | Bribery of public official |

This criminal complaint is based on these facts:
Attached Affidavit of Special Agent John R. Moore, Homeland Security Investigations

Approved as to form: _____, AUSA

☑ Continued on the attached sheet.

_____
Complainant's signature
Special Agent John R. Moore, HSI
Printed name and title

Sworn to before me and signed in my presence.

Date: __12/9/14__

_____
Judge's signature

City and state: __San Francisco, CA__ __Hon. Laurel Beeler__
Printed name and title



# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, JOHN R. MOORE, being duly sworn, hereby state:

## INTRODUCTION

1. I have been employed as a Special Agent with the Department of Homeland Security, Homeland Security Investigations or "HSI" (formerly, Immigration and Customs Enforcement, or "ICE"), since April 2007. I am currently assigned to the Office of Investigations, San Francisco Human Smuggling/Human Trafficking group. As a Special Agent with HSI, my duties include the investigation and enforcement of all United States Customs and Immigration laws and regulations. My training includes a twelve-week Criminal Investigator Training Program, a twelve-week HSI Special Agent Training at the Federal Law Enforcement Training Center located in Glynco, Georgia, and training seminars in Customs law and human rights violations. My experience includes the racketeering investigation and prosecution of the San Francisco-based *Mara Salavatrucha* gang clique on various racketeering conspiracy, racketeering murder, and related charges, which was charged as *United States v. Ivan Cerna, et al.*, CR 08-0730 WHA.

2. This Affidavit is being submitted in support of a criminal complaint charging: TOM KIM LOI LAM and JIMMY GONG YAN LEE, a/k/a "Gong Yan Lee," with (1) conspiring to commit bribery relating to a federal program, in violation of 18 U.S.C. § 371; and (2) bribery relating to a federal program, in violation of 18 U.S.C. §§ 666(a)(2) and 2; and TOM KIM LOI LAM with bribery of a public official, in violation of 18 U.S.C. § 201(b)(1)(B).

3. I am familiar with the facts as set forth herein based on my conversations with other law enforcement officers, as well as from my personal review of information contained in the reports of other law enforcement officers, and other records and/or documents and other evidence obtained as a result of this investigation. Because this Affidavit is submitted for the limited purpose of establishing probable cause that LAM and LEE committed the charged crimes, I have not included everything I know about this matter in this Affidavit. In addition, where I report information learned from other sources, such information is reported in sum and substance and in relevant part.

## FACTUAL BASIS FOR PROBABLE CAUSE

### Counts One and Two (Bribery Relating to a Federal Program and Conspiracy)

4. I learned from my investigation of this matter that the Emeryville Police Department ("EPD") is a local police department in charge with maintaining law and order in Emeryville, California. During each of the twelve month periods from roughly 2013 through the present, the EPD received at least $10,000 in federal funding.

5. In or about February 2012, HSI initiated an investigation into allegations that various massage parlors in the Oakland/Emeryville/Berkeley area were, in fact, operating as brothels and may have transported women across state and national lines. In or about March 2012, HSI began working jointly with EPD to investigate one of the massage parlors under suspicion, Acucare Oriental Spa ("Acucare"), located at 3900 Adeline Street in Emeryville. As part of this investigation, in or about May 2012, HSI Special Agents posing as Emeryville code enforcement officers conducted an unannounced inspection of Acucare. I learned from other law enforcement officers – including an EPD officer who, as described below, posed as a corrupt police officer

(the "Officer") – as well as reviewing recordings and reports that, following this inspection, the following occurred:

   a. In or about May 2012, defendant TOM KIM LOI LAM contacted the EDP and requested an opportunity to discuss the status of Acucare. Beginning on or about June 2012, LAM met with the Officer several times and claimed he was speaking on behalf of the individuals operating Acucare, JIMMY GONG YAN LEE and LEE's wife. During these meetings, which were generally recorded, LAM discussed Acucare's business with the Officer.

   b. On or about September 28, 2012, EPD officers directed a confidential informant ("CI-1") into Acucare to determine if any of the employees of Acucare would offer sex for money. During a massage, a female employee of Acucare asked CI-1 what he wanted. CI-1 asked the employee how much it would cost for "full service" – that is, sexual intercourse – and the employee answered $160. As directed by the EPD, CI-1 left without engaging in any sexual activity. This discussion was surreptitiously recorded.

   c. On or about January 31, 2013, the Officer met with LAM met LEE in Emeryville. The Officer advised LAM and LEE that Emeryville's Municipal Code was changing to come into alignment with California state law requiring massage practitioners and massage establishments to obtain and possess a California Massage Therapy Counsel ("CAMTC") certification. In response, LAM expressed concern that the "girls" working at Acucare would not be able to obtain this certification due to lack of proficiency in English and asked the Officer if there was any way he (the Officer) could get CAMTC certification for the "girls." The Officer replied that he did not think he could get CAMTC certificates and added that he was taking a big chance letting Acucare continue to operate and that he could get into trouble if his chief looked into the matter. LAM appeared to explain what the Officer stated to LEE, who nodded. This meeting was surreptitiously recorded.

   d. On or about February 18, 2013, LAM faxed to the Officer a copy of a CAMTC certificate that was subsequently confirmed as a legitimate certificate. LAM told the Officer that he intended to send an additional certificate to the Officer, but never did so. Three days later, on or about February 21, 2013, LAM and LEE met with the Officer in Emeryville. LEE handed the Officer two copies of CAMTC certificates, one a copy of the certificate that LAM had already faxed to the Officer three days earlier. The Officer told LEE that he knew that there were more than two women working as "masseuses" at Acucare and asked LEE what LEE thought he should do about the other women. LAM added that the females rotated from city to city as well. LEE responded that he was trying to get fake CAMTC certificates for the women. The Officer then reiterated that he was taking a big risk allowing Acucare to operate. LAM asked what would happen if Acucare were to get caught without the certificate, and the Officer explained that the employees and the owner would be cited and that the business would eventually be shut down. The Officer told LAM and LEE that they needed to get the women working at Acucare certified. This meeting was surreptitiously recorded.

   e. On or about March 13, 2013, EPD officers directed another confidential informant ("CI-2") into Acucare to determine if any of the employees of Acucare would offer sex for money. During a massage, the masseuse touched CI-2 provocatively, and CI-2 asked the masseuse how much it would cost for "everything" – that is, sexual intercourse – and the masseuse answered $160. As directed by the EPD, CI-2 left

without engaging in any sexual activity. This discussion was surreptitiously recorded.

f. On or about March 18, 2013, EPD officers performed an unannounced compliance inspection of Acucare. EDP officers encountered LEE's wife behind the counter as well as four females in the lobby. The EPD officers asked to see CAMTC certificates for the employees as well as for the business. None of the individuals present had certificates and were cited. LEE subsequently arrived and the officers explained to LEE that citations were being issued because of the lack of CAMTC certificates and explained how LEE could get the certificates.

g. The next day, on or about March 19, 2013, LAM called the Officer and stated that some Acucare employees had been cited by the EPD for not having CAMTC certificates. LAM stated that he wanted to meet with the Officer. In response, the Officer asked if LEE was going to be meeting as well, and LAM explained that LEE was out of the country and that he (LAM) had the authority to "negotiate."

h. On or about March 20, 2013, LAM met the Officer in Emeryville for a meal. During this meeting, the Officer showed LAM the citations issued relating to Acucare. LAM stated that Acucare's female employees travel around the country looking for work at various massage parlors. The Officer expressed concern allowing Acucare to continue to operate, and LAM responded by telling the Officer that this type of problem was not uncommon in this type of business. LAM added that when his associates in another city had problems, the owners of the massage parlors gave him money to pay off police officers. The Officer asked LAM if any of the police officers who took such payments were arrested, and LAM assured the Officer that no police officers have been arrested on his watch. After LAM and the Officer finished eating, LAM asked the Officer to come to his car. The Officer obliged, and, in the car, LAM told the Officer that he told LEE he was going to take care of it, and then handed the Officer a white envelope. The Officer asked LAM what was in the envelope and LAM told him it was $2,000. The Officer exited LAM's car and later confirmed that the envelope handed to him by LAM contained $2,000 in U.S. currency. This meeting was surreptitiously recorded.

i. On or about March 25, 2013, the Officer spoke with LAM on the telephone. The Officer told LAM that the citations were taken care of and LAM told the Officer that he was not comfortable speaking on the telephone and asked if they could meet for lunch the following day. However, no meeting occurred the next day.

j. On or about May 8, 2013, the Officer met with LAM in Emeryville. The Officer and LAM discussed Acucare and LAM stated that he thought LEE was making between $10,000 and $15,000 per month from Acucare. The Officer said that he thought that $500 per female per month would be a fair price for him to be paid. LAM said that he had to talk to LEE first but he did not think this amount would be a problem. This meeting was surreptitiously recorded.

k. On or about May 16, 2013, the Officer and LAM met again and LAM said that $500 per female per month was good. LAM asked the Officer when he wanted the payments to start and the Officer told him he wanted it to start the following day. This meeting was surreptitiously recorded.

l. On or about May 18, 2013, LAM met the Officer again in Emeryville. LAM handed the Officer a bag with an envelope and told the Officer that it contained

      cookies. The Officer asked how much was in the bag, and LAM said that it contained two thousand for four people. The Officer later confirmed that the bag contained an envelope that contained $2,000 in U.S. currency. This meeting was surreptitiously recorded.

   m. On or around June 13, 2013, LAM met the Officer in Emeryville and gave the Officer a white paper bag and stated it was from LEE. The Officer later confirmed that the bag contained $2,000 in U.S. currency. This meeting was surreptitiously recorded.

   n. Between in or about March of 2013 and in or about May of 2014, LAM paid the Officer approximately $2,000 each month on behalf of LEE to keep Acucare from being shut down. In all, LAM paid the Officer more than $20,000 in U.S. currency to keep Acucare in business.

   o. On or about June 24, 2014, the Officer met with LEE in Emeryville. The Officer asked LEE if he knew that LAM was paying him $2,000 per month to keep Acucare from being shut down. LEE acknowledged that he knew and told the Officer that he provided LAM with the cash to pay the Officer. LEE added that he did not trust LAM anymore and told the Officer that he thought LAM was cooperating with federal law enforcement authorities in the investigation of marijuana growing operations. The Officer asked LEE if he wanted to continue to pay $2,000 per month and LEE stated that he did want to continue paying but he wanted to cut LAM out of the process and instead personally provide the Officer with the money. This meeting was surreptitiously recorded.

### Count Three (Bribery of Public Official)

6. During the investigation of LAM and LEE's bribery of the Officer of the EDP, LAM also asked the Officer if the Officer knew how he (LAM) could acquire immigration documents. I learned from other law enforcement officers – including an HSI Special Agent who, as described below, posed as a corrupt employee of a non-specific federal immigration agency (the "Agent") – as well as reviewing recordings and reports that the following occurred:

   a. On or about July 1, 2013, the Officer introduced the Agent to LAM and told LAM that the Agent worked for a federal agency that had the power to grant Legal Permanent Resident status. During this meeting, LAM informed the Agent that he planned on bringing individuals of Chinese descent to the Agent for "green cards" i.e., Lawful Permanent Resident ("LPR") cards. LAM assured the Agent that the individuals had "clear" backgrounds and that the only issue that might pose a problem was that most of them were already in the United States illegally.[1] LAM explained that these were people who simply did not return to China and have remained in the United States without legal authorization. LAM told the Agent that he had ten to fifteen people in mind as potential green card candidates. The Agent suggested that LAM identify the individuals in an email so that the Agent could perform preliminary immigration and criminal history checks, but LAM replied that he did not like the idea. LAM explained that he did not like to talk about business over the telephone, much less conduct business over email. The Agent asked LAM how he thought the

---

[1] Based on my training and experience, illegal presence in the United States in and of itself is not an automatic disqualifier for someone to seek LPR status or citizenship. However, in order to obtain LRP status from illegal status, an individual must apply for some other type of immigration relief first, such as asylum, which may or may not ever be granted and often leads to years, if not decades, of waiting to adjust to LPR status. The incentive to pay to avoid a long wait and uncertainty is, thus, readily apparent.

    payments should be made for the green cards, and LAM said: "Whatever you like, however you like." The Agent suggested that the payments be made in a way that was not traceable, and LAM agreed and said that all transactions should be paid in cash and that everyone involved should be extremely careful. They agreed that half of the total payment would be due during an initial meeting at which the Agent would take fingerprints of the applicants, while the second payment would be due upon delivery of the green cards. This meeting was surreptitiously recorded.

   b. On or about July 15, 2013, LAM met with the Officer and the Agent in a hotel room in Emeryville so that the Agent could process an alien ("Alien-1"), a female Chinese national, for LPR status in exchange for $10,000. LAM brought Alien-1 to the meeting and introduced her to the Officer and the Agent. The Agent directed Alien-1 to fill out immigration paperwork and also took Alien-1's fingerprints. Alien-1 showed the Agent documents indicating she was in the United States on a valid F1 student visa that was soon to expire.[2] While the Agent was processing Alien-1, LAM took the Officer into another room and handed the Officer an envelope later found to contain $10,000 in U.S. currency. At the end of the meeting, Alien-1 and LAM asked the Agent how long it would be before the green card was ready. The agent advised them that the process could take several weeks and that the Agent would contact LAM when the green card was ready. This meeting was surreptitiously recorded.

   c. On or about July 18, 2013, LAM met with the Officer and the Agent to discuss future deals. LAM mentioned that he had good candidate for the next green card. LAM described the individual as a Chinese national, a businessman who visited the United States to do business on a regular basis, but did not provide the candidate's identity. LAM also clarified for the Officer and the Agent how he did business with his green card customers. LAM stated that there was no middle man between himself and the customers. The customers paid him directly and he took 10% as his fee. LAM said he was happy with his cut and confirmed that he would take the same fee for any customer no matter how difficult the case might be. This meeting was surreptitiously recorded.

   d. On or about August 7, 2013, LAM met with the Officer and the Agent to discuss processing another green card applicant, "Alien-2." The Agent confirmed to LAM that it would cost $30,000 for a green card for Alien-2 instead of the $20,000 charged for Alien-1. The Agent explained to LAM that Alien-2's application was more complicated, and therefore riskier, which meant that Alien-2's application would cost more money. LAM agreed with the price and said he was fine with taking his 10% cut of $3,000. The Agent suggested that LAM take his cut before paying the Agent, and LAM agreed. This meeting was surreptitiously recorded.

   e. On or about August 9, 2013, LAM brought Alien-2 to a hotel room in Emeryville so that the Agent could process Alien-2 for a green card. Alient-2 provided the Agent with his Chinese passport, which showed that he was legally in the United States on a

---

[2] Based on my experience and training, whether or not ALIEN-1 was in the country legally on a F1 student visa, and when that visa was set to expire, is not relevant to LPR status. As immigration law currently stands, there is no special program that allows holders of F1 student visas to apply directly for LRP status. They must first seek some other form of immigration status, such as an H1B employment visa, before being eligible to apply for LPR status or citizenship. Therefore, ALIEN-1 and LAM had an incentive to pay to circumvent standard immigration pathways.

valid B1/B2 temporary visitor visa.[3] Alien-2 asked the Agent regarding the possible repercussions of being processed for a green card while traveling in and out of the United States on a valid visa. The Agent told Alien-2 that it would be ideal for him to limit his travel until he received the green card. The Agent proceeded to have Alien-2 fill out paperwork and took Alien-2's fingerprints. While the Agent processed Alien-2, LAM gave the Officer an envelope full of cash. This time, the Officer counted the cash in front of LAM and determined the total to be $13,500. Alien-2 told the Agent that once the green card was ready, it could be forwarded to his sister, who permanently lives in Los Angeles. This meeting was surreptitiously recorded.

f. On or about October 18, 2013, the Officer and the Agent met with LAM to discuss business. LAM stated that he had five to ten people interested in obtaining the green cards that the Agent was selling. Most of these potential customers came to the U.S. in possession of tourist visas and decided to stay past the authorized period of the stay in order to obtain unauthorized employment. The Officer asked LAM how he recruited customers. LAM replied that the Chinese community has its way of telling each other and added that he was very careful about with whom he talks. This meeting was surreptitiously recorded.

g. On or about December 10, 2013, LAM brought two female applicants ("Alien-3" and "Alien-4") to a hotel room in San Francisco so that the Agent could process them for a green card. In LAM's presence, the Agent had Alien-3 and Alien-4 fill out paperwork and took their fingerprints. LAM then provided the Agent with $20,000 in U.S. currency and arranged to pay the Agent another $20,000 upon delivery of the green cards. This meeting was surreptitiously recorded.

h. On or about January 14, 2014, the Officer and the Agent arranged to meet LAM to deliver the fraudulently obtained green cards for Alien-1 and Alien-2 for $23,500. The Agent presented LAM with the green cards, but LAM did not have any money. As a result, the Agent explained to LAM that he could not have the green cards until he paid. LAM agreed and left. This meeting was recorded. LAM later called the Agent and explained that he was receiving a wire transfer of funds from China and would need to go to San Francisco to retrieve the money. LAM proposed that they meet in the afternoon to complete the transaction. Later that afternoon, LAM met with the Officer and the Agent and said he wanted to conduct the exchange of money for green cards in a bathroom. The Agent told LAM that no one was paying attention. In response, LAM handed an envelope to the Agent under a table between them; the envelope was later found to contain $23,500 in U.S. currency. The Agent, in turn, passed the green cards for Alien-1 and Alien-2 to LAM. This afternoon meeting was also surreptitiously recorded.

---

[3] Based on my experience and training, B1/B2 visa holders have no pathway to directly apply for LPR status or Citizenship.

## CONCLUSION

7. Based on the forgoing, I respectfully submit that there is probable cause to believe that LAM and LEE violated Title 18, United States Code, Sections 371, 666(a)(2), and 2, while LAM violated Title 18, United States Code, Section 201(b)(1)(B). I therefore request that warrants be issued for their arrest for these crimes. In addition, because LAM and LEE have not yet been arrested for these crimes, I respectfully request that this complaint, the requested warrants, and any related documents be sealed because public disclosure may cause LAM, LEE, and witnesses to flee or destroy evidence.

JOHN R. MOORE
Special Agent, Homeland Security Investigations

Subscribed and sworn to before me:

On December 9, 2014

HON. LAUREL BEELER
United States Magistrate Judge